

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-18-1999

# Travelers Indemnity v. DiBartolo

Precedential or Non-Precedential:

Docket 98-1589

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Travelers Indemnity v. DiBartolo" (1999). *1999 Decisions.* Paper 69.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/69

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 18, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-1589

TRAVELERS INDEMNITY COMPANY
OF ILLINOIS

v.

JOSEPH N. DIBARTOLO, Appellant

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 96-cv-06238)
District Judge: Honorable Harvey Bartle, III

Argued: January 28, 1999

Before: BECKER, Chief Judge, SCIRICA and ROSENN,
Circuit Judges.

(Filed March 18, 1999)

        BRUCE MARTIN GINSBURG,
         ESQUIRE
        GREGORY D. DiCARLO, ESQUIRE
         (ARGUED)
        Ginsburg & Associates
        2112 Walnut Street
        Philadelphia, PA 19103

        Counsel for Appellant

CONRAD J.J. RADCLIFFE, ESQUIRE
R. BRUCE MORRISON, ESQUIRE
  (ARGUED)
Marshall, Dennehey, Warner,
 Coleman & Goggin
1845 Walnut Street
Philadelphia, PA 19103

Counsel for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

This case requires us to predict whether the Pennsylvania
Supreme Court would hold that Pennsylvania law allows a
corporation to waive uninsured/underinsured motorist
("UM") coverage for its employees under a company
insurance policy. If we decide that it can, we must then
address whether the District Court properly granted
summary judgment on the ground that the corporation in
this case did so waive. We answer both questions in the
affirmative; hence we affirm the judgment of the District
Court.1

I. Facts & Procedural History

The basic facts are simple. In the scope and course of his
employment, Joseph DiBartolo was driving a vehicle owned
and insured by his employer, Knight-Ridder Inc. ("KRI"),
when he was injured in an accident. DiBartolo does not
own a personal vehicle, and so his only auto insurance
comes through KRI. The car that struck him was uninsured
as defined by Pennsylvania law.

Travelers Indemnity Co. ("Travelers"), KRI's insurer,
_____

1. While we considered certifying the corporate waiver question to the
Pennsylvania Supreme Court pursuant to its order, see No. 197 Judicial
Admin. Dkt. No. 1 (Pa. Oct. 28, 1998), we concluded that the issue was
neither sufficiently important nor sufficiently difficult to command the
attention of that tribunal.

2

brought a declaratory action to determine whether Travelers is obliged to provide him with uninsured motorist benefits despite KRI's attempts to waive such coverage. The District Court first granted summary judgment for Travelers on the ground that workers' compensation was DiBartolo's exclusive remedy. We reversed, predicting that Pennsylvania would hold to the contrary, see Travelers Indemnity Co. v. DiBartolo, 131 F.3d 343 (3d Cir. 1997) (DiBartolo I),2 and on remand the District Court again granted summary judgment for Travelers because it found that KRI had validly waived UM coverage for its insureds. See Travelers Indemnity Co. v. DiBartolo, No. 96-6238, 1998 U.S. Dist. LEXIS 10060 (E.D. Pa. June 24, 1998) (DiBartolo II).

## II. Corporate Waiver

In 1990, Pennsylvania enacted the Motor Vehicle Financial Responsibility Law ("MVFRL") to control rapidly increasing insurance costs. See Nationwide Mut. Ins. Co. v. Cummings, 652 A.2d 1338 (Pa. Super. Ct. 1994). At that time, UM coverage became completely waivable in Pennsylvania, and KRI signed UM coverage rejection forms that year.

Under 75 Pa. Cons. Stat. S 1731(a) (1997), the amount of UM coverage is automatically equal to the bodily injury limits of a policy unless the insured effectively exercises the option to lower or waive such coverage. The law specifies the appropriate waiver language:

> By signing this waiver I am rejecting uninsured motorist coverage under this policy, for myself and all relatives residing in my household. Uninsured coverage protects me and relatives living in my household for losses and damages suffered if injury is caused by the negligence of a driver who does not have any insurance to pay for losses and damages. I knowingly and voluntarily reject this coverage.

_____

2. Our prediction was recently confirmed by the Pennsylvania Supreme Court in Gardner v. Erie Insurance Co., 109 W.D. Appeal Dkt. 1997, 1999 Pa. LEXIS 154 (Pa. Jan. 26, 1999).

3

75 Pa. Cons. Stat. S 1731(b).3

Such was the language of the waiver KRI executed, but DiBartolo, noting that KRI is a corporation, argues that the plain text of the waiver language ("I," "myself," "[my] relatives residing in my household") indicates that the legislature must have envisioned the waiver to apply only to personal auto insurance policies. Because the legislature never explained how a corporation could waive UM coverage, he argues that a corporation cannot waive, or that at least all covered employees must join in the waiver for it to be effective as to them. DiBartolo also invokes the principle that the MVFRL is to be construed liberally in close cases to afford injured plaintiffs the greatest possible coverage. See Danko v. Erie Ins. Exchange, 630 A.2d 1219, 1222 (Pa. Super. Ct. 1993), aff'd, 649 A.2d 935 (Pa. 1994). He notes that state public policy disfavors waiver unless the law is strictly followed. That principle, however, goes to how easy it is to waive and not to who may waive.

The District Court found that the "linguistic style of the rejection form, designed for easy comprehension," does not evidence a legislative intent to prohibit corporations or other legal entities from executing a waiver.4 DiBartolo II, 1998 U.S. Dist. LEXIS 10060, at *6. We agree. Section 1731(b) specifically provides that "[t]he named insured shall be informed that he may reject uninsured motorist coverage by signing the following written rejection form," which suggests that any named insured may do so. Furthermore, under the Pennsylvania Statutory Construction Act, 1 Pa.

_____

3. In addition, S 1731(c.1) provides that "Any rejection form that does not
specifically comply with this section is void."

4. DiBartolo points out that Travelers never attempted to get the insurance commissioner's approval for a corporate waiver form. However, the law makes no provision for a corporate waiver form. Instead, it provides the specific language that must be used in a waiver form in S 1731(b); if Travelers had tried other language, it would have been out of compliance with the law. See Lucas v. Progressive Cas. Ins. Co., 680 A.2d 873 (Pa. Super. Ct. 1996) (even minor deviations from the section 1731 requirements, such as not printing the forms on separate sheets of paper, invalidate the waiver). Travelers used the form provided by law, and, even if the language sounds somewhat strange, it is evident what the waiver means as to KRI.

4

Cons. Stat. S 1902, words of the masculine gender include feminine and neuter forms, and thus "he" may stand for a corporation.

In addition, while the MVFRL supports broad coverage, it also reflects a public policy to control escalating insurance costs, which would be thwarted if corporations could not reject UM coverage. See Paylor v. Hartford Ins. Co., 640 A.2d 1234 (Pa. 1994). It is possible for an insured to reject UM coverage for members of his or her household, which suggests that the choice to reject coverage does not have to be individual but may be made by the person withfinancial responsibility for the policy. Finally, the MVFRL specifically provides that UM coverage is optional, see S 1731(a), but if DiBartolo were correct it would not be very optional for corporations.5

There are Pennsylvania cases that find it unremarkable that a corporate entity can waive UM coverage. The issue in this case was not squarely before those courts and thus those decisions are not controlling. Nevertheless, they are worth discussing, since Pennsylvania's courts have been hostile to attempted waivers if they are not perfectly executed. Even with this general presumption against waiver, Pennsylvania courts have not suggested that corporations are incapable of waiver.

In Blakney v. Gay, 657 A.2d 1302 (Pa. Super. Ct. 1995), the court denied the claim of a plaintiff seeking to recover under a rental company's insurance policy. The plaintiff was an unauthorized driver and thus the car was treated as if it were uninsured. The court noted that both the rental company and the person who rented the car rejected UM coverage. The court concluded that UM coverage "may be waived by a car rental company." Id. at 1303. DiBartolo argues that the renter's rejection was the crucial fact, and we agree that this is a relevant distinction. We find the court's reasoning telling, however, because it assumed that a corporation can waive UM coverage. In Blakney the court

_____

5. DiBartolo suggests that each employee would have to waive UM coverage to effectuate a corporate waiver, but that theoretical possibility
seems unlikely to have practical reality in a large corporation, or one with heavy employee turnover.

5

emphasized that the plaintiff was a stranger to the contract lacking privity, whereas DiBartolo submits that he is a third-party beneficiary of the contract (a contention Travelers does not contest). We do not find that distinction relevant under these circumstances.

In Caron v. Reliance Insurance Co., 703 A.2d 63 (Pa. Super. Ct. 1997), an employee operating a non-company vehicle was held not to be entitled to UM coverage from her employer because she was not operating a covered vehicle. The court found that the employer, not the employee, was the "insured," even though the employee was on a list of drivers the employer submitted to the insurance company. The court also noted that a reference to "you" in an insurance policy referred to the employer, a corporation. See id. at 68 & n.9. This is evidence that standard language, employed for easy understanding, also covers corporations.6

Travelers argues that the insurance department's regulations support its interpretation. At 31 Pa. Code S 68.101 (1997), there is a list of forms and notices that must be sent by insurers to their insureds. Section 68.101(a) gives the initial list, and then (b) provides that

_____

6. There are also two relevant federal cases applying Pennsylvania law. In DeSilva v. Kemper National Insurance Co., 837 F. Supp. 98 (E.D. Pa. 1993), the court found that the insurer was bound to afford UM coverage to an injured employee who was insured under the policy, even though the employer waived coverage. In that case, however, the insured vehicle was the plaintiff 's personal car, registered in his name, and deductions were taken from his paycheck to pay for the insurance. Under the circumstances, the court found that he had to be provided with the opportunity to waive UM coverage, since the insurance was in a real sense his. He was not given that opportunity, and so he received full UM coverage. Similarly, DiBartolo cites Cincinnati Insurance Co. v. Herr Signal & Lighting Co., 757 F. Supp. 490 (M.D. Pa. 1991), as a case in which the court held that, even if a corporation can waive UM coverage, the individual covered must be provided the option to do so. In that case, one person (one of the company's owners) was a named insured, not just a covered person. Since the court found a knowing and intelligent waiver by the individual, it did not need to decide the issue DiBartolo raises. Moreover, if we were to apply the principle beyond named insureds to all covered persons, it would contradict the statute's clear provision that a policyholder has the power to waive for his or her entire household.

certain forms, identified in 75 Pa. Cons. Stat.SS 1705(a)(1) & (3), 1791.1(b) & (c), and 1792(b)(1), are not applicable to commercial insureds. Travelers contends that this regulation shows that the section 1731 waiver of UM coverage, which is not among the forms excluded by 31 Pa. Code S 68.101(b), does apply to commercial insureds. This is a reasonable argument based on the interpretive canon of expressio unius est exclusio alterius. If we were to find that the statute clearly contradicted the administrative agency's interpretation, we could discount the agency view, but we do not find that to be the case here. See Pysh v. Security Pac. Housing Serv., 610 A.2d 973 (Pa. Super. Ct. 1992).

For the foregoing reasons, we conclude that Pennsylvania allows a corporation to waive UM coverage when the corporation is the named insured.7

III. Effective Waiver

Even if corporations generally can waive UM coverage, DiBartolo argues that KRI did not effectively do so. It is KRI's corporate policy to reject UM coverage in any state where that is allowed, and to take the lowest possible coverage wherever UM coverage is mandatory. The District Court found that KRI's waiver was valid because the 1990 UM rejection form and the 1994–1995 policy used the statutorily required language. DiBartolo has several objections, some of which we reject in the margin.8

_____

7. We need not address the issue, addressed in DeSilva, of Pennsylvania law's application to a situation in which a company provides a personal vehicle for an employee, as the facts in this case are quite different.

8. DiBartolo argues that the rejection forms were not signed prior to the date of the accident. This argument is meritless. The District Court found that KRI's risk management director signed Pennsylvania UM coverage rejection forms on January 1, 1994. Although there was evidence in the record that KRI had not signed some states' UM rejection forms as of late January 1994, KRI is a national company and Travelers provides KRI with insurance in numerous states. Travelers introduced a checklist into the record that identifies which states' forms KRI's representative had not yet signed and returned as of January 1, 1994. Forms for Pennsylvania were not outstanding. See App. at 260. The

7

A. New Policies and Renewals

Pennsylvania requires a substantial amount of
information to be given at the time a new auto insurance
policy is issued. DiBartolo argues that the 1994 policy was
a new policy, not a renewal, and thus, because Travelers
did not supply the requisite amount of information along
with the policy, it did not comply with the law. Defects in
providing information for a new policy might invalidate the
waiver.9

_____

record does not create an issue of material fact, since there is no
credible
evidence that the Pennsylvania waiver forms were unsigned before the
accident.

DiBartolo also contends that the individual who signed the forms for
KRI had no authority to bind the company. While DiBartolo points to
Louisiana cases indicating that a corporate resolution is required to
waive UM coverage, there is no evidence that this is Pennsylvania's law.
It is not even always true in Louisiana. See, e.g., Thibodeaux v. Burton,
538 So. 2d 1001, 1004 n.1 (La. 1989). DiBartolo cites to Lokay v. Lehigh
Valley Cooperative Farmers, Inc., 492 A.2d 405 (Pa. Super. Ct. 1985), but
that case does not concern authority to waive UM coverage. Both of KRI's
risk managers submitted affidavits that they were told that it was their
job to procure insurance for KRI and to get the lowest possible UM
coverage. There is no evidence in the record that they lacked authority
to waive UM coverage for KRI. Even if they lacked actual authority, no
reasonable fact finder could conclude that they lacked apparent
authority, which would also suffice to bind KRI. See id. at 409.

DiBartolo further contends that KRI could not waive UM coverage
without union consent. Uninsured motorist coverage is a fringe benefit,
according to DiBartolo I, 131 F.3d at 351, and thus a proper subject for
collective bargaining. Yet that does not mean that KRI could not act
without union consent in the absence of any agreement to the contrary.
The union may make UM coverage a mandatory bargaining issue, but
until it does so KRI does not lack authority to negotiate coverage on its
own behalf.

9. However, in Nationwide Mutual Insurance Co. v. Murphy, Nos. 98-CV-
1692 & 98-CV-1884, 1998 U.S. Dist. LEXIS 17641 (E.D. Pa. Nov. 3,
1998), the District Court held that there was no private remedy for a
violation of section 1791's initial notice requirement. This holding is in
tension with the Superior Court case of National Union Fire Insurance Co.
v. Irex Corp., 713 A.2d 1145 (Pa. Super. Ct. 1998), which found a waiver

8

DiBartolo's evidence that the policy was not a renewal is
as follows: Extensive negotiations take place between
Travelers and KRI each year before the policy is issued.
Each year takes the previous year's policy as the starting
point, not the original contract as it was signed the first
year of coverage. Vehicles are dropped and added each
year, and premiums fluctuate. Moreover, Travelers makes a
point of having KRI re-execute its waiver forms. KRI solicits
offers from other potential insurers and has no intention to
be bound beyond the duration of each year's contract.
Travelers concedes that at no time after 1990 did it provide
KRI with the information mandated by section 1791 for new
policies.

Pennsylvania law only defines a renewal for certain
noncommercial automobile insurance policies, not
encompassing the policy at issue here:

> "Renewal" or "to renew" means the issuance and
> delivery by an insurer of a policy superseding at the

_____

invalid where initial section 1791 notice was not properly provided. The
Superior Court did not hold that there was a direct private remedy for
the violation of section 1791; instead, it held that, without valid
notice,
the court could not find that waiver was valid under section 1731,
because the insured did not have all of the relevant information
necessary to make an informed decision. The statute explicitly provides
that an invalid initial section 1731 notice voids policy limits.

Complicating matters further, the Pennsylvania Supreme Court
recently decided Donnelly v. Bauer, Nos. 0033 to 0039 Appeal Dkt. 1997,
1998 Pa. LEXIS 2113 (Pa. Sept. 29, 1998). Each of the appellants in that
case, upon applying for insurance, received a notice that explained the
difference between limited and full tort options, and each elected the
limited tort option, receiving a lower premium. The notice did not, as 42
Pa. Cons. Stat. S 1705(a)(1) requires, contain comparisons of the actual
annual premiums under each option. The court noted that the
appellants benefited from their bargain and held that there was no
private remedy, as in Salazar. Irex Corp. was specifically addressed to
UM coverage, which exists for different reasons than the full/limited tort
options. But there appears to be a growing gap between the
Pennsylvania Supreme Court and lower state courts on the meaning and
purpose of the MVFRL; the high court seems unwilling to stand on
formalities, while the lower courts retain a rigid insistence on the same
in order to further the policy of protecting accident victims.

end of the policy period a policy previously issued and delivered by the same insurer, such renewal policy to provide types and limits of coverage at least equal to those contained in the policy being superseded, or the issuance and delivery of a certificate or notice extending the term of a policy beyond its policy period or term with types and limits of coverage at least equal to those contained in the policy being extended . . . .

40 Pa. Cons. Stat. S 1008.1(2) (1998). While this definition does not compel a result in this context, it does provide support for our conclusion that the 1994 policy was a renewal, since it indicates that Pennsylvania recognizes that a policy that changes somewhat from year to year can still constitute a renewal.

We do not think that this evidence creates a material issue of fact as to whether the 1994 contract was a renewal. KRI consistently sought the lowest possible coverage, no matter which particular vehicles were covered. Travelers persuasively argues that the scale of the contract makes a difference, such that changes in specific vehicles covered do not convert a renewal into a new policy; a commercial insured with a large fleet will inevitably experience vehicle turnover. Furthermore, the record is replete with references by KRI and Travelers to a "renewal," evidencing the parties' understanding that they were continuing an ongoing relationship with minor alterations. The parties did not need a contractually enforceable obligation to renew on identical terms in order to make each year's policy a "renewal" instead of a new policy, which is what DiBartolo's argument amounts to. See Mouton v. Guillory, 494 So. 2d 1374, 1377 (La. Ct. App. 1986) (rejecting a similar argument that significant changes converted a renewal into a new policy).

In conclusion, we find that DiBartolo has not demonstrated a material issue of fact on the issue of whether KRI's policy was a new policy or a renewal. As we are satisfied that KRI's policy was, legally, a renewal, Travelers was not required to give the full notice mandated for new policies in Pennsylvania.

10

B. The Section 1791 Notice

DiBartolo argues that Travelers did not properly give the "Important Notice" required by section 1791. That section requires, at the time of application for original coverage, that the insurer provide an "Important Notice" of benefits and limits available that also reminds the insureds to contact their insurance agents with any questions. The notice must advise insureds that their signature on the notice or their payment of renewal premiums is evidence of their knowledge and understanding of the benefits and limits available as well as those actually selected. If the insurer strictly follows section 1791, there is a conclusive presumption that the waiver of UM coverage is valid. See Insurance Co. v. Miller, 627 A.2d 797, 799 (Pa. Super. Ct. 1993). Unlike section 1731, however, section 1791 does not contain a provision voiding the benefits and limits chosen if the insurer does not strictly comply with that section. Furthermore, the District Court found, and DiBartolo does not contest, that the "Important Notice" given in 1984, the time of the initial contract, was valid.10

In Salazar v. Allstate Insurance Co., 702 A.2d 1038 (Pa. 1997), the insured signed a valid section 1791.1 notice in the original application, but the insurer failed to comply with section 1791.1's renewal notice provisions. (Section 1791.1 is similar to section 1791; it provides for disclosure of premium charges and tort options.) The Pennsylvania Supreme Court held that there was no private remedy for the insurer's admitted noncompliance with the renewal law. The Salazar court cited cases holding that, even though a violation of the initial UM rejection form requirement in section 1731(c.1) will void the waiver of UM coverage, that section does not provide a remedy for violation of its renewal notice requirement. See Maksymiuk v. Maryland Cas. Ins. Co., 946 F. Supp. 379 (E.D. Pa. 1996). The structure of the provisions is as follows: When someone applies for insurance, the insurer must provide certain information; failure to provide the information as required

_____

10. KRI also paid renewal premiums, which evidences its knowledge and understanding of available benefits according to the explicit provisions of
section 1791.

11

voids a waiver of UM coverage; on renewal, information must also be provided. From that structure, the Pennsylvania court concluded that only initial noncompliance voids a section 1791.1 waiver, and that only the state administrative agency could enforce the renewal provisions. The District Court concluded that the same was true of section 1791, so DiBartolo could not benefit from an invalid renewal notice.

DiBartolo correctly notes that Salazar would be distinguishable if we found that there was a new policy in 1994 or that the original notice was flawed; in that case, no valid section 1791 notice would ever have been signed, and we would have to determine the import of such a defect. However, our decision that the District Court properly found that the 1994 policy was a renewal means that we do not have to address DiBartolo's arguments on this point. DiBartolo does not challenge the claim that the initial 1984 notice was sufficient, nor does he suggest that the 1990 notice, given when KRI dropped UM coverage entirely, was inadequate. Under Pennsylvania law, he has no private remedy if the renewal notices were inadequate.

The judgment of the District Court will be affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

12